# STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

### v.

# Todd A. BRECHT, Defendant-Appellant.

Supreme Court

*No. 86–1317–CR. Argued December 2, 1987.—Decided March 23, 1988.*

(Also reported in 421 N.W.2d 96.)

For the plaintiff-respondent-petitioner the cause was argued by *Jeffrey M. Gabrysiak,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

For the defendant-appellant there was a brief by *Janet A. Jenkins* and *Arneson & Jenkins, S.C.,* La Crosse and oral argument by *Janet A. Jenkins.*

WILLIAM A. BABLITCH, J. The State of Wisconsin (State) seeks review of a court of appeals' decision, *State v. Brecht,* 138 Wis. 2d 158, 405 N.W.2d 718 (1987), that reversed the judgment of conviction for first degree murder entered against Todd A. Brecht (Brecht) by the circuit court for Buffalo county, Judge Peter G. Pappas. The court of appeals based its reversal on the grounds that references to Brecht's pre-trial silence during cross-examination and during the State's closing argument impermissibly infringed on Brecht's constitutional rights to silence and to a fair trial, and that such errors were prejudicial.

While we agree that some of the State's references to Brecht's silence were constitutional error, we hold that such error was harmless. In considering the other issues raised on appeal, we conclude that the circuit court properly exercised its discretion in admitting evidence of Brecht's homosexuality because such evidence may have been relevant to the issue of motive. However, the circuit court erred in ruling that the State could cross-examine Brecht's character witness about Brecht's prior convictions. Nonetheless, we conclude that Brecht was not prejudiced by this error. Accordingly, we reverse the decision of the court of appeals.

On October 17, 1985, Brecht shot and wounded his brother-in-law, Roger Hartman (Hartman), who was the district attorney for Buffalo county, Wisconsin. Hartman died several weeks later. Brecht was arrested on the day of the shooting and subsequently tried by jury. He argued at trial that the shooting was accidental. The jury, however, found him guilty of the first degree murder of Hartman. The following facts are relevant to this appeal.

302

On October 12, 1985, Molly and Roger Hartman went to the Georgia State prison to secure the release of Molly Hartman's younger brother, Brecht. At that time, Brecht was imprisoned after conviction for a felony theft of $3,750. His release from prison and placement on probation were conditioned on payment of $3,750 in restitution for his theft. The Hartmans paid his restitution and obtained his release and the transfer of his probation to Wisconsin. The conditions of Brecht's probation, as stated in defense counsel's brief, consisted of the following: "1) not violating the law of any government; 2) avoiding injurious and vicious habits—especially alcoholic intoxication, and; 3) not leaving the State without permission."

The Hartmans brought Brecht to their home in Alma, Wisconsin, where he was to stay until an opening in an Eau Claire halfway house became available. The Hartmans told Brecht that while he lived in their home he was to refrain from homosexual activity in the Alma area and from drinking.

Brecht testified that on the day of the shooting he had been drinking and playing with a gun that belonged to Roger Hartman while the latter was at work and Molly Hartman was out shopping. Brecht had been using the gun to shoot at tin cans in the Hartman's yard. After firing the gun, Brecht testified that he saw Roger Hartman pull into the driveway. Because Brecht did not want Hartman to see him with the gun, he ran into the rear garage and entered a downstairs hallway. Brecht explained that he intended to replace the gun in the upstairs room where he had found it.

With the gun in hand, Brecht stopped to listen for Hartman. Hearing nothing, Brecht testified that he started running for the stairs to the upper level when

he tripped and the gun discharged. A bullet struck Hartman in the back.

Brecht yelled to Hartman and looked for him but Hartman had disappeared. Brecht then took Molly Hartman's car and drove around the area searching for Hartman. Upon spotting Hartman at the door of a neighbor's house, Brecht drove off in the car. The Hartman car was observed traveling at a faster than normal speed away from Alma and towards Fountain City.

Neighbors of the Hartmans testified that Roger Hartman had come to their house seeking help and told them that Brecht had shot him. Police officers who had surveyed the Hartman residence after the shooting, testified that they had found beer cans in the house, and a liquor bottle and a soda can with a bullet hole in it and spent .22 casing in the backyard. Experts from the State Crime Laboratory testified that Brecht's fingerprints were on an ammunition box and on a brandy bottle found in the Hartman home. Additionally, it was noted that the doorway area leading into the hallway from the garage was covered with tightly stretched carpet and that nothing was observed on which one could trip.

Meanwhile, Brecht had driven the Hartman car into a ditch near Fountain City, rendering the car inoperable. Officer Zeller arrived and offered Brecht assistance with the car, but Brecht told Zeller that his sister would call a wrecker for him. Brecht subsequently obtained a ride from a stranger, Melvin Schlesselman, to the nearest town, Winona, Minnesota. He did not mention the shooting incident to either Schlesselman or Zeller.

In Minnesota, Brecht was stopped by the Winona police in a shopping center. He falsely identified

himself and when his true identity was ascertained, he was arrested by the police for the shooting of Hartman in Wisconsin. Brecht told officer Papke, one of the arresting officers, that it was a mistake and that he wanted to talk with "somebody that would understand [him]." However, neither Brecht's testimony nor that of the police officers' indicate that Brecht explained the shooting incident upon arrest.

The record is unclear when Brecht received his *Miranda* warnings. The State submitted testimony by two of the five officers involved in the arrest, who testified that Brecht was not given his *Miranda* warnings in their presence. However, the record does reflect that Brecht did receive his *Miranda* warnings at his initial appearance.

On November 11, 1985, Hartman died. A coroner testified that the bullet wound was a substantial factor in producing his death. He also testified that the bullet which entered Hartman's back and exited his chest, traveled on a basically horizontal to slightly downward trajectory.

At trial, the State questioned Zeller, Schlesselman and Papke during its case-in-chief about Brecht's failure to mention Hartman's condition and the accidental nature of the shooting. Additionally, the State attempted to directly impeach Brecht's credibility by cross-examining Brecht on his pre-trial silence concerning the shooting and by making reference to his silence during closing argument.

The State also sought to introduce evidence of Brecht's homosexuality to establish a possible motive for the shooting. The circuit court permitted the introduction of such evidence, over Brecht's objection, noting its relevancy to the issue of motive. During trial, the State produced letters Brecht had written to

an inmate in the Georgia prison where Brecht had been incarcerated. The State alleges that one of the letters contained homosexual overtones, a fact Brecht disputes. Additionally, the State elicited testimony from Molly Hartman on Brecht's homosexuality. Molly Hartman testified at trial that her husband had disapproved of Brecht's homosexuality. However, she gave conflicting testimony as to whether her husband had communicated this disapproval directly to Brecht.

Brecht sought to call his probation officer to testify about Brecht's non-violent character. The circuit court ruled that the introduction of such evidence would also permit the State to cross-examine the officer about Brecht's conviction for writing worthless checks. Consequently, Brecht chose not to call his probation officer and rested his case.

Additionally, both parties stipulated to the filing of ex parte briefs to the court. These briefs were subsequently filed in open court.

The jury found Brecht guilty of first degree murder by use of a dangerous weapon. He was sentenced to life in prison with penalty enhancement for use of a dangerous weapon and for being a repeat offender. Brecht appealed the judgment of conviction.

The court of appeals reversed the conviction on the grounds that the State's references to Brecht's silence impermissibly infringed Brecht's right to silence and to a fair trial, and that such references were prejudicial. The court further concluded that the circuit court erred in admitting evidence of Brecht's homosexuality and in ruling that the State could cross-examine the probation officer on Brecht's worthless checks conviction.

The State subsequently filed a petition to review with this court, seeking reversal of the court of

appeals' decision. The petition was granted on July 29, 1987.

The central question presented on review is whether Brecht's constitutional rights to silence[1] and to a fair trial were violated by the State's references to his silence. The references at issue include: 1) elicitation of evidence on Brecht's pre-*Miranda* silence during the State's case-in-chief, 2) references to Brecht's pre-*Miranda* silence after Brecht elected to testify, and 3) comments on Brecht's post-*Miranda* silence during the State's cross-examination of Brecht and closing argument. If such references were constitutional error, we must also determine whether the error was harmless beyond a reasonable doubt. Brecht asserts that references to his silence in all three contexts were constitutional error and prejudicial.

We first consider Brecht's claim that the elicitation of evidence on his silence during the State's case-in-chief violated his right to silence secured under Art. I, Sec. 8 of the Wisconsin Constitution and the fifth amendment of the United States Constitution. The references challenged by Brecht consist of testimony elicited from three State witnesses, officer Zeller, Melvin Schlesselman, and officer Papke, during the State's case-in-chief.[2] Because the record does not

---

[1]Although Art. I, Sec. 8 of the Wisconsin Constitution and the fifth amendment of the United States Constitution do not expressly include the phrase "right to silence," that phrase has become a shorthand for describing the rights encompassed within the privilege against compelled self-incrimination and is used in that sense throughout this opinion.

[2]Brecht also objects to the following testimony elicited from deputy Bratner during the State's case-in-chief:

"Q. Did you arrest the defendant?
"A. I served the arrest warrant on him, yes.

reflect that Brecht received his *Miranda* warnings until his initial appearance, we treat this testimony as references to Brecht's pre-*Miranda* silence.

The first reference to Brecht's silence was elicited from officer Zeller, the officer who spoke with Brecht when his car was in the ditch.

"Q. Did you speak with this person [Brecht]?
"A. Yes.
"Q. What did you say?
"A. I asked him for his name, and I also asked him if he needed a wrecker, and where he was from.
"Q. What did he respond?
"A. He stated his name was Todd Brecht, and he stated that he was from Alma. In reference to the wrecker he said, 'My sister will get a wrecker from Alma.'
"Q. Did he say anything else?
"A. No."

Brecht asserts that the State made a similar inquiry into his silence on direct examination of Melvin Schlesselman, the individual who gave Brecht a ride to Winona, Minnesota. Schlesselman testified on direct examination by the State:

"Q. At any time during that period of time did he ever ask you to call and (sic) ambulance for anyone?
"A. No sir.
"Q. Did he ever ask you to call the police for him?

"Q. Did you give him Miranda warning?
"A. No."

We conclude that this testimony does not constitute a reference to Brecht's silence and, therefore, do not consider it in our analysis.

"A. No sir.
"Q. Did he ever mention a Roger Hartman to you?
"A. No sir."

Lastly, Brecht objects to the testimony elicited during the State's examination of officer Papke on redirect. Papke was one of the officers who apprehended Brecht in Winona for the shooting.

"Q. Officer Papke did you or anyone else in your presence advise the defendant of his constitutional rights?
"A. No.
"Q. Now you stated he said it was a big mistake—did he say what was a big mistake?
"A. No he didn't.
"Q. Did he offer any explanation about anything whatever?
"A. No.
" . . . .
"Q. Was he advised as to why he was being taken into custody?
"A. Yes he was.
"Q. Again you stated what?
"A. I told him he was sought by Buffalo County authorities for a shooting incident in Wisconsin.
"Q. Did he explain anything about a shooting incident to you?
"A. No he didn't.
"Q. To anyone else in your presence?
"A. Not to my knowledge, no."

To ascertain whether these references violated Brecht's constitutional right to silence, we must examine the nature of the right and when it attaches.

The proscription against use of a defendant's silence is derived from the privilege against self-incrimination found in Art. I, Sec. 8 of the Wisconsin Constitution. *See Rudolph v. State,* 78 Wis. 2d 435, 442, 254 N.W.2d 471 (1977) (per curiam), citing, *Griffin v. California,* 380 U.S. 609, 85 S. Ct. 1229 (1965). This privilege, also guaranteed under the fifth amendment of the United States Constitution, provides that "[n]o person may be ... compelled in any criminal case to be a witness against himself or herself." Wisconsin Const. Art. I, Sec. 8. The United States Supreme Court has broadly construed the fifth amendment privilege to prohibit compelled self-incrimination not only in criminal proceedings but "in all settings in which ... freedom of action is curtailed in any significant way. ..." *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S. Ct. 1602 (1966).

As a corollary to the fifth amendment privilege, the Supreme Court has recognized an individual's right to remain silent and not have the exercise of his or her fifth amendment privilege used by the prosecution at trial. In *Miranda,* the Court noted that the prosecution may not use at trial the fact that a defendant stood mute or claimed his privilege in the face of accusation. *Miranda,* 384 U.S. at 486 n. 37. Similarly, in *Griffin,* the Supreme Court held it was constitutional error for the prosecution to use a non-testifying defendant's silence against him at trial. *Griffin,* 380 U.S. 609. To allow otherwise, the Court reasoned, would penalize the defendant for the exercise of his privilege and erode its protections by making the assertion of the privilege costly. *Id.* at 614.

Consistent with this precedent, this court has held that it is a violation of the right to remain silent for the State to present testimony in its case-in-chief on the defendant's election to remain silent during a

custodial investigation, after arrest. *Rudolph,* 78 Wis. 2d at 442. Further, in *Reichhoff v. State,* 76 Wis. 2d 375, 251 N.W.2d 470 (1977), we acknowledged that the right to silence attaches at the time of a defendant's arrest, even though no police interrogation or questioning occurs. *Id.* In that case, we held that it was constitutional error for the State to elicit testimony during its case-in-chief on the defendant's silence upon arrest. Such testimony included statements from an arresting officer that the defendant, "just put his wrists out ... for the handcuffs and never said a word." *Id.* at 377 n. 1.

More recently, in *State v. Fencl,* 109 Wis. 2d 224, 325 N.W.2d 703 (1982), we recognized that the right to silence also attaches when an individual is being questioned by the police, prior to arrest and receipt of *Miranda* warnings. *Id.* In *Fencl,* the State had violated the defendant's constitutional rights by referring to the defendant's pre-arrest, pre-*Miranda* silence in its case-in-chief. As we stated,

> "Any time an individual is questioned by the police, that individual is compelled to do one of two things—either speak or remain silent. If both a person's prearrest speech and silence may be used against that person, as the state suggests, that person has no choice that will prevent self-incrimination. This is a veritable 'Catch–22.' ... We hold that a person is entitled to the protection of the Fifth Amendment even prior to arrest or a custodial interrogation." *Id.* at 237.

Brecht asserts that *Fencl* dictates that all reference to pre-*Miranda* silence violates the protections of the privilege against compelled self-incrimination. Therefore, he maintains that the State's elicitation of testimony on his pre-*Miranda* silence from Schlessel-

man and Zeller was constitutional error. However, the defendant's silence in *Fencl* occurred prior to his arrest and receipt of *Miranda* warnings, and at a time when the defendant was being questioned by police during a murder investigation. To conclude that Brecht's silence during his encounters with both men was constitutionally protected would extend the right to silence to circumstances beyond those presented in *Fencl*. We decline to so hold.

■

Rather, we conclude that Brecht's right to silence was not implicated in his encounters with Schlesselman and Zeller. A reasonable person in Brecht's position would not conclude that either of these meetings was coercive or in any way curtailed Brecht's freedom of action. *See State v. Koput,* 142 Wis. 2d 370, majority at 379, 418 N.W.2d 804 (1988) citing *Berkemer v. McCarty,* 468 U.S. 420 (1984) (employing an objective test to assess whether a suspect is "in custody" for purposes of receipt of *Miranda* warnings). Schlesselman was an ordinary citizen, not a governmental officer. There was nothing coercive about Brecht's exchange with Schlesselman. Similarly, officer Zeller's brief inquiry and offer of assistance to Brecht was not coercive nor restrictive of Brecht's freedom. We emphasize that the right to silence is derived from the privilege against *compelled* self-incrimination. Absent circumstances such as those present in *Fencl,* that might compel a reasonable person to speak and incriminate himself or herself, the privilege against compelled self-incrimination does not arise. Thus, the testimony elicited from Schlesselman and Zeller during the State's case-in-chief did not violate Brecht's rights under Art. I, Sec.

8 of the Wisconsin Constitution and the fifth amendment of the United States Constitution.[3]

█

We further conclude that it was not constitutional error for the State to elicit officer Papke's testimony on Brecht's pre-*Miranda* silence during redirect. Brecht had "opened the door" to such inquiry into his silence when Brecht's counsel cross-examined Papke and raised, for the first time, Brecht's statements that it was a "big mistake" and that Brecht "wanted to talk to someone." Specifically, the following cross-examination occurred,

> "Q. After you had taken him into custody he made a statement to you as you approached the squad car didn't he?
> "A. Yes.
> "Q. In fact he told you that it was a big mistake, he wanted to talk to someone.
> "A. Yes he did.
> "Q. He never explained further to you what he meant by 'big mistake,' did he?
> "A. No he didn't."

---

[3]Brecht also argues that this testimony should have been excluded as irrelevant. We disagree. Brecht's silence about the shooting during his encounters with Schlesselman and Zeller is relevant to the issue of his credibility and the State's theory that if Brecht had accidentally shot Hartman he would have sought help. In contrast to an individual's silence in the face of governmental coercion, where the right to silence is implicated, Brecht's silence under the circumstances presented here is not "insolubly ambiguous." *See Reichhoff,* 76 Wis. 2d at 382, (noting that a defendant's custodial silence is "insolubly ambiguous" because such silence may be attributable to the fact that the defendant is exercising his right to silence), citing *Doyle v. Ohio,* 426 U.S. 610 (1976).

Because Brecht's counsel initially raised the issue of Brecht's silence when under arrest, the State was free to subsequently elicit Papke's testimony on Brecht's silence during arrest on redirect. *Accord United States v. Robinson,* 1988 U.S. Lexis 942 (no violation of the fifth amendment for a prosecutor to refer to defendant's failure to testify where such remark is a "fair response to a claim made by the defendant or his counsel"); *United States v. Shaw,* 701 F.2d 367, 384 (5th Cir. 1983).

Brecht next contends that his right to silence was further infringed by repeated references to his pre-*Miranda* silence during cross-examination and closing argument by the State. However, based on our recent decision in *State v. Sorenson,* 143 Wis. 2d 226, majority at 258, 421 N.W.2d 77 (1988) we conclude that such references do not violate a defendant's right to silence under Art. I, Sec. 8 of the Wisconsin Constitution once the defendant elects to testify. In *Sorenson,* we held that a testifying defendant may be impeached with his pre-*Miranda* silence.[4] *See also Jenkins v. Anderson,* 447 U.S. 231 (1980) (in which the United States Supreme Court declared that the fifth amendment is not violated when a testifying defendant is impeached with his pre-arrest silence). Thus, once Brecht chose to testify, the State was free to refer to his failure to tell authorities about the accidental nature of the shooting without infringing upon his constitutional right to silence.

---

[4]While the author of this opinion disagreed with the majority's curtailment of the right to silence in *Sorenson, see* 143 Wis. 2d 226, slip op. (Bablitch, J., concurring), and continues to adhere to that position, the resolution of this issue is controlled by the holding in *Sorenson.*

Finally we address Brecht's claim that the State's references to his post-*Miranda* silence during cross-examination and closing argument violated his right to a fair trial under the due process clause of the federal and state constitutions. Because the record does not show that Brecht received his *Miranda* warnings until the time of his initial appearance, we only consider those comments which encompass his silence after his initial appearance and prior to trial. The first challenged reference to Brecht's post-*Miranda* silence occurred during the State's cross-examination of Brecht,

> "Q. In fact the first time you have ever told this story is when you testified here today was it not?
> " . . . .
> "A. You mean the story of actually what happened?
> "Q. Yes.
> "A. I knew what happened, I'm just telling it the way it happened, yes, I didn't have a chance to talk to anyone, I didn't want to call somebody from a phone and give up my rights, so I didn't want to talk about it, no sir."

The State inquired on re-cross examination,

> "Q. Did you tell anyone about what had happened in Alma?
> "A. No I did not."

Additionally, Brecht argues that the State's comments during closing argument were constitutional error,

> "and remember that Mr. Brecht never volunteered until in this courtroom what happened in the Hartman residence. ...

"....

"He sits back here and sees all of our evidence go in and then comes out with this crazy story. ...

"....

"I know what I'd say, I'd say, I'd say 'hold on, this was a mistake, this was an accident, let me tell you what happened,' but he didn't say that did he. No, he waited until he hears our story."

█

It is well established that it is fundamentally unfair and a violation of a defendant's constitutional right to due process to use a defendant's silence after receipt of *Miranda* warnings for impeachment purposes at trial. *Doyle,* 426 U.S. 610 (constitutional error to impeach a defendant with his post-arrest, post-*Miranda* silence); *Fencl,* 109 Wis. 2d 224; *see also Fletcher v. Weir,* 455 U.S. 603 (1982) (per curiam) (where the Supreme Court limited its holding in *Doyle* by concluding that due process concerns do not prohibit impeachment with post-arrest, pre-*Miranda* silence), *accord Sorensen,* 143 Wis. 2d at 256. The basis for this holding is twofold. First, because an arrestee's silence following *Miranda* warnings may be nothing more than his or her exercise of *Miranda* rights, post-*Miranda* silence is insolubly ambiguous. Second, and more important, it would be fundamentally unfair to allow an arrestee's silence to be used to impeach an explanation subsequently offered at trial after he or she has been impliedly assured, by *Miranda* warnings, that silence will carry no penalty. *Doyle,* 426 U.S. at 617–18.

█

Brecht's post-*Miranda* silence is, therefore, constitutionally protected at trial. The State's assertions that Brecht did not volunteer his explanation of the

accidental nature of the shooting until the State presented its evidence at trial were comments on Brecht's post-*Miranda* silence and as such were constitutional error. We are unpersuaded by the State's attempts to characterize this improper use of Brecht's silence as merely a reference to "the defense tactic of not committing itself to a theory of defense prior to the presentation of the state's case."

Although it was constitutional error for the State to refer to Brecht's post-*Miranda* silence during cross-examination and closing argument, we conclude, contrary to the court of appeals, that this error does not require reversal. A constitutional error is considered harmless if the court is "able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24 (1967). This requires that the court find that there is no "reasonable possibility" that the error "contributed to the conviction." *State v. Dyess,* 124 Wis. 2d 525, 543, 370 N.W.2d 222 (1985); *Chapman,* 386 U.S. at 23. The relevant factors considered when determining harmless error include: 1) the frequency of the error, 2) the nature of the State's evidence against the defendant, and 3) the nature of the defense. *Rudolph,* 78 Wis. 2d at 443.

In the present case, the improper references to Brecht's silence were infrequent. The four references comprised less than two pages of a 900 page transcript, or a few minutes in a four day trial in which twenty-five witnesses testified. Although the court of appeals emphasized the "length" of the State's comments on Brecht's silence, *Brecht,* 138 Wis. 2d at 167, the court was including as error references to Brecht's

silence during cross-examination. Because such references were found permissible in *Sorenson,* we limit our evaluation to references to Brecht's post-*Miranda* silence. Although we recognize that such references to a defendant's silence have a high potential for prejudice, *Reichhoff,* 76 Wis. 2d at 382, we conclude that in the present case the infrequency of the references in the context of the entire trial mitigated any possible prejudicial effect on the jury. *Accord Fencl,* 109 Wis. 2d at 238–39 (six references to defendant's silence during a five day trial were harmless beyond a reasonable doubt).

The other factors to consider are the strength of the evidence against Brecht and the nature of Brecht's defense. It is undisputed that Brecht shot Hartman. Brecht testified at trial that the shooting was an accident. However, the State introduced strong circumstantial evidence that the shooting was intentional, including evidence of motive. Hartman told several persons that Brecht had shot him in the back. Brecht never secured help for Hartman, although he had ample opportunity to do so. Instead, Brecht fled the scene and, ultimately, the state. Additionally, the physical evidence contradicts Brecht's assertion that the shooting was accidental. The horizontal trajectory of the bullet into Hartman's back is inconsistent with Brecht's testimony that the gun accidentally discharged as he was falling. Officers who surveyed the Hartman house after the shooting did not observe anything in the downstairs hallway which would have caused Brecht to trip. As we have noted in previous cases, a finding of guilt may be based upon circumstantial evidence alone. *Rudolph,* 78 Wis. 2d at 444.

██ In conclusion, given the infrequency of the references in the context of the entire trial and the strength of the State's evidence against Brecht, the State's references to Brecht's silence were harmless beyond a reasonable doubt.

The second source of alleged error raised on appeal is whether the circuit court erred in permitting the State to make reference to and introduce evidence on Brecht's homosexuality. Prior to trial, Brecht had brought several motions to bar all references to his homosexuality on the grounds that such evidence was both irrelevant and prejudicial. The State sought to introduce evidence of Hartman's disapproval of Brecht's homosexuality as a motive for the shooting. In particular, the State sought to question Molly Hartman about her husband's disapproval of Brecht's homosexuality and his communication of this disapproval to Brecht.

The trial court acknowledged the prejudicial nature of such evidence but concluded that it should be admitted because it was relevant on the issue of motive. During trial, the court also permitted the State to introduce letters Brecht wrote to an inmate in the Georgia prison where Brecht had been incarcerated. One letter indicated that Brecht planned to raise $50,000 and obtain his friend's release. Brecht objected to the admission of the letter because of its homosexual overtones and the possibility of prejudice.

The court of appeals held that the circuit court erred in admitting evidence of Brecht's homosexuality. The court of appeals reasoned that such evidence was irrelevant because of the lack of connection between Brecht's sexual preference and motive. However, we conclude that there was sufficient evidence linking Brecht's lifestyle to a motive for the shooting

such that the evidence of Brecht's homosexuality was relevant.

A circuit court has broad discretion in determining the relevance and admissibility of proffered evidence. *State v. Pharr*, 115 Wis. 2d 334, 342–45, 340 N.W.2d 498 (1983). When reviewing a question on the admissibility of evidence, an appellate court must determine whether the court exercised its discretion in accordance with accepted legal standards and with the facts of record. *McCleary v. State*, 49 Wis. 2d 263, 182 N.W.2d 512 (1971). The test is not whether this court agrees with the ruling of the circuit court, but whether appropriate discretion was in fact exercised. *State v. Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979).

Under sec. 904.02, Stats., relevant evidence is generally admissible. The criterion of relevancy is whether the evidence sought to be introduced has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Section 904.01. This court has recognized that while motive is not an element of any crime it may nevertheless be a proper subject of inquiry and admissible if it meets the same standards of relevance as other evidence. *State v. Berby*, 81 Wis. 2d 677, 686, 260 N.W.2d 798 (1978) ("Motive is an evidentiary circumstance which may be given as much weight as the fact finder deems it entitled to.").

In the present case, the circuit court found that the evidence referring to Brecht's homosexuality and Hartman's objections to Brecht's homosexuality did suggest a possible motive for the shooting and, therefore, made more probable the State's claim that

Brecht had in fact murdered Hartman. The record reflects that Hartman disapproved of Brecht's homosexuality and that this disapproval was conveyed to Brecht by the restrictions Hartman and his wife imposed on Brecht while he lived in their home. These restrictions included that Brecht was to refrain from homosexual conduct and from inviting homosexual friends to the Hartman home. Thus, it is not unreasonable to infer that Brecht's homosexuality, which prompted restrictions on his lifestyle, could furnish a motive for the shooting.

Moreover, Brecht's correspondence with a fellow inmate in the Georgia prison revealed that Brecht wanted to return to Georgia to obtain his friend's release. While the precise nature of Brecht's relationship with this individual is unclear from the record, Brecht's counsel acknowledged that one of the letters had strong homosexual overtones. It is not unreasonable to infer from this evidence that Brecht planned to return to Georgia, in violation of the conditions of his probation, to aid his friend. Additionally, it is not unreasonable to infer that Hartman, as the district attorney for Buffalo county, may have felt added responsibility in ensuring that his brother-in-law complied with his probation conditions. Thus, Brecht's desire to return to Georgia could also furnish the grounds for a dispute with Hartman and a motive for murder.

Based on the foregoing, we conclude that the circuit court did not abuse its discretion in holding that evidence of Brecht's homosexuality is probative of motive for the charged crime of first degree murder, and that the probative value of this evidence outweighs any possible prejudicial effect. We further note that the circuit court sought to minimize any prejudi-

ce to Brecht by instructing the jury on the limited purpose for which the evidence could be considered:

> "The evidence that the defendant is a homosexual ... was also received solely so you could understand his presence in the Hartman home and the conditions imposed by them.
>
> "You must not conclude that because he ... is a homosexual ... that it is proof that he committed the offense with which he is now charged. That evidence was received only to give you the whole picture of the relationship between him and the Hartmans."

Thus, we reverse that portion of the court of appeals' decision which found an abuse of circuit court discretion in regard to the admissibility of evidence on Brecht's homosexuality.

Brecht also argues that the circuit court erred in ruling that the State could cross-examine Brecht's probation officer on Brecht's worthless check conviction if Brecht called the officer to testify about Brecht's non-violent character. While we agree that this ruling was error, we do not find that the error was prejudicial to Brecht.

Section 904.04(1)(a), Stats., permits an accused to introduce evidence of a pertinent character trait and the prosecution to also introduce evidence to "rebut the same." Section 904.04(1)(a). Evidence of a defendant's character for nonviolence has been recognized as a pertinent character trait in a prosecution for first degree murder. *See King v. State,* 75 Wis. 2d 26, 38–39, 248 N.W.2d 458 (1977).

According to the record, Brecht's primary purpose in calling his probation agent as a witness was to have her testify about his non-assaultive, non-violent character. The circuit court ruled that once this testimony

was proffered it would "open the door" to the State's cross-examination of the agent on Brecht's worthless check convictions. However, under sec. 904.04(1)(a), Stats., the State's introduction of character evidence is limited to that which rebuts the character trait being established, or in this case, Brecht's character for non-violence. Because Brecht's worthless check convictions are completely unrelated to the character trait of non-violence, the circuit court's ruling was in error.

Nonetheless, while the circuit court's ruling was improper it does not constitute reversible error. Brecht's defense was not undermined by the jury's failure to hear the probation agent's opinion on Brecht's character for non-violence. Additionally, as noted earlier, the State's evidence against Brecht was strong. Thus, in the absence of a reasonable possibility that this error contributed to the jury's decision to convict Brecht, we find that the circuit court's ruling was harmless error. *Dyess,* 124 Wis. 2d 525.

Finally, Brecht argues that he was denied a fair trial by the content of the State's ex parte brief submitted to the circuit court. However, upon review of the State's ex parte brief and the record, we conclude that Brecht was not denied a fair trial.

*By the Court.*—The decision of the court of appeals is reversed.

JUSTICE LOUIS J. CECI did not participate.