COURT OF APPEALS
DECISION
DATED AND FILED

February 21, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1847-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2016CF164

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

ROBERT L. BREEDEN,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Rusk County:   STEVEN P. ANDERSON and ANGELINE E. WINTON, Judges. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Robert Breeden appeals from a judgment convicting him of second-degree reckless endangerment, battery, and disorderly conduct (each as an act of domestic abuse), and from an order denying his postconviction motion.[1] Breeden raises multiple claims of ineffective assistance of his trial counsel and one due process claim. In addition to determining that Breeden failed to adequately preserve most of his claims, we conclude that counsel did not render ineffective assistance. Accordingly, we affirm the judgment and order.

## BACKGROUND

¶2 The charges in this case were based upon allegations that, over the course of an evening, Breeden repeatedly beat his girlfriend, Rachel,[2] and struck her multiple times with the butt of a rifle. Although Breeden and Rachel had been involved in a long-term relationship that included past incidents of violence, the State did not file a motion in limine seeking to admit other-acts evidence.

¶3 During the jury trial, Rachel testified that Breeden had been her boyfriend for twenty-one years and that things started to get "ugly" about six or seven years into the relationship. Rachel said that Breeden had a temper and "would go out drinking and come home in the middle of the night and he was just all[-]over moody and … verbal or abusive because he was drunk." Sometimes,

---

[1] The Honorable Steven P. Anderson presided over the jury trial and entered the judgment of conviction. The Honorable Angeline E. Winton presided over the postconviction relief hearing and entered the order denying Breeden's postconviction motion.

[2] This matter involves the victim of a crime. Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym instead of the victim's name. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

Breeden would get "physical" and "punch or slap and kick" her. Rachel sought medical attention "[q]uite a few times" after these incidents for a variety of injuries, including a popped eardrum; a sliced cornea; knocked-out teeth; broken facial bones; and injuries to her ribs, knee, thigh, and ankle. In addition, over approximately the past four years, Breeden required Rachel "to be with him all of the time" and would not allow her to go out alone.

¶4     Breeden's trial counsel eventually raised a relevancy objection to what he termed "this history lesson" line of questioning. After the circuit court directed the State to "stay away from the specifics" of what the court referred to as "almost … prior bad acts," the State moved on to question Rachel about the incident underlying the charges.

¶5     Rachel testified that Breeden began berating her while she was driving them to a friend's house, telling her that when they arrived she needed to look at the ground and not make eye contact. Breeden then accused Rachel of being featured in videos that he was looking at on his phone, called her "a lot of dirty names," and "punch[ed]" and "smack[ed]" her a few times in the face and on her arms and shoulders. When they later arrived home, Breeden screwed the patio and front doors shut with an electric screwdriver and made sure that all the windows were locked, as was his routine.

¶6     While they were sitting on the couch, Breeden looked at pornographic websites on his phone, and he accused Rachel of being depicted in pictures on them. Rachel denied that she was in any of the pictures, pointing out differences in hair color, body shape, and tattoos. Breeden then began punching Rachel in the face and on her shoulders while "saying very nasty things." After Rachel moved away from Breeden to a nearby chair and pretended to fall asleep,

3

Breeden went to the bathroom and returned with a 12-gauge shotgun, which was missing its stock. Breeden continued to accuse Rachel of being in the pictures, calling her a "fucking slut" and "whore." He told her that he had a bullet in the shotgun and that when he proved it was her in the pictures, she was "done." Rachel again pretended to fall asleep, hoping that Breeden would pass out.

¶7 When Rachel "peeked" several hours later, Breeden noticed that she was awake. Breeden then pulled Rachel out of the chair, punched her multiple times, knocked her to the ground, and kicked her. As Rachel tried to pull herself up from the ground, Breeden grabbed one of two 30/30 lever-action rifles that were in the house and began to hit Rachel in the head with the stock of the rifle until the stock broke. At that point, Breeden tried to stab Rachel in the torso with a pointed shard on the broken stock.

¶8 Breeden pulled the trigger of the rifle while it was pointed at Rachel, but it did not go off. Rachel fought Breeden for control of the rifle. Breeden fired the rifle during the struggle, and the shot went through an open closet door. Breeden then got really upset, and Rachel "took a lot of the hits" before Breeden finally told Rachel she better get out before he killed her. Rachel was then able to unscrew the front door and escape.

¶9 Rachel fled to her parents' house. She did not immediately call law enforcement, however, because Breeden had threatened to kill Rachel's entire family, and she believed him. A few days later, Rachel's mother convinced her to report the assault.

¶10 Rusk County Deputy Sheriff Rae Pyfferoen investigated Rachel's complaint. Pyfferoen noted that Rachel was "amped up" and "pretty shaky" during the interview. Pyfferoen observed and photographed abrasions and

4

bruising to Rachel's head, arms and torso. Pyfferoen also reviewed a medical report documenting fresh contusions to Rachel's torso, as well as older injuries to Rachel's body.

¶11 The State asked Pyfferoen whether, in her opinion, the actions Rachel reported would constitute criminally reckless conduct. The circuit court sustained an objection from Breeden's trial counsel, Attorney Adrian Longacre, before Pyfferoen answered it. However, Pyfferoen testified without objection that she administered to Rachel a "lethality assessment" screening questionnaire that categorized Rachel as being at "high risk" for becoming a homicide victim.

¶12 The State also asked Pyfferoen whether she ever had an opportunity to speak with Breeden about the case. Pyfferoen stated that she had not because, while being transported to jail, Breeden had told another law enforcement officer that he would not speak to him without an attorney. The State then asked Pyfferoen what it typically means to law enforcement "when someone can't be located after an incident has been reported." Pyfferoen responded: "After an incident has been reported and someone is not willing to speak with you and if they don't want to talk to you, there are reasons that they don't want to talk to you like fear of getting in trouble or—." At that point, Longacre cut off Pyfferoen with an objection, which was sustained. Longacre did not move to strike the testimony Pyfferoen had already given. The circuit court later gave a pattern instruction to the jury to disregard any question that the court did not allow to be answered, without the jury guessing at what the answer might have been. *See* WIS JI—CRIMINAL 147 (2000).

¶13 Rusk County Deputy Sheriff Marc Egle testified that he executed a search warrant at Breeden and Rachel's residence and recovered a shotgun and a

30/30 rifle. The shotgun was missing its stock and magazine, and the stock of the 30/30 rifle was broken. Egle also observed a calendar on the wall of Breeden and Rachel's residence with notations that Rachel "Left at 1154 AM" and "fucking Whore" written over the squares for the two days after the incident. Egle testified without objection that, in his experience working with firearms, pulling the trigger of a firearm, either after pointing it at someone or during a struggle, is reckless.

¶14 During closing argument, the State reiterated its opening statement that domestic violence is all about "power and control," accompanied by a visual aid showing the domestic violence cycle. The State argued that Breeden had engaged in a "pattern throughout their relationship" of intimidating, emotionally abusing, isolating, recklessly endangering, and falsely imprisoning Rachel. It cited Pyfferoen's testimony that Rachel had been assessed to be at a high risk for homicide by domestic violence, based upon objective factors, including the reported use of a weapon in this case. The State later commented—in response to a defense argument regarding Rachel's delayed reporting—that defense counsel had "not been subjected to 15 years of continual abuse," implying that Rachel had been.

¶15 In discussing the evidence supporting the reckless endangerment charge, the State referred to Breeden hitting Rachel in the car while she was driving, hitting her while she was on the couch in their home, and beating her with the rifle, and pulling the trigger of a loaded gun while it was pointed at Rachel. The State explicitly referred to Egle's opinion as to what constituted reckless use of a firearm, arguing that Breeden's conduct of hitting Rachel with a weapon was reckless whether the weapon discharged or not. The State argued that the photographed bruises on Rachel's back and arms were consistent with defensive injuries suffered while on the floor trying to block blows.

6

¶16    In addition, after noting that law enforcement officers were unable to locate Breeden until several days after the incident, the State commented:

> So was he evading law enforcement?  People who evade law enforcement don't want to talk about it.  And he has the right not to want to talk about anything.  But guilty people will usually not want to talk about it and they will avoid that.  And leaving is something that you can look at for your common sense.

Longacre did not object to any of the State's comments during closing argument.

¶17    Following his convictions on all three charged counts, Breeden moved for a new trial on the reckless endangerment count based upon ineffective assistance of his trial counsel.  Breeden asserted that Longacre should have raised additional objections to the testimony and closing arguments related to past violent incidents between Breeden and Rachel, testimony about the lethality assessment, Egle's opinion as to what constituted reckless conduct, and comments by Pyfferoen and the State on Breeden's silence.  Breeden further claimed that Longacre should have challenged the jury instructions and verdict form on the reckless endangerment count as duplicitous.  Breeden argued that the cumulative effect of counsel's alleged errors was prejudicial to his defense.

¶18    The circuit court held an evidentiary hearing at which Longacre testified.  Breeden's postconviction attorney, Steven Miller, asked Longacre why he did not seek a mistrial or a curative instruction after Pyfferoen testified that Breeden would not speak to police until he had a lawyer and that defendants might not want to talk due to fear of getting in trouble.  Miller also asked why Longacre did not object to the State's reference during closing argument to Breeden's silence.  Longacre responded that he did not feel Pyfferoen's testimony was prejudicial because it was "just common sense" that someone would not want to

7

speak to police without a lawyer. Longacre differentiated that situation from the prejudice that would result from a comment on a defendant's invocation of his right not to testify at trial. Longacre could not recall any reason why he did not object to the prosecutor's comment during closing argument that "guilty people will usually not want to talk about it."

¶19 Miller did not ask why Longacre failed to raise an other-acts objection when Rachel testified about significant past injuries that Breeden had inflicted upon her, or why he waited so long to object to the entire line of questioning on relevance grounds. Miller also did not ask Longacre why he failed to object to Pyfferoen's testimony about the lethality assessment or to Egle's opinion about what constituted reckless conduct, or why Longacre did not raise a duplicity challenge. Nonetheless, Longacre provided some of his reasoning for these omissions on cross-examination. Longacre testified that he felt his eventual relevance objection was essentially "synonymous" with an other-acts objection "[i]n this case" and that he was satisfied when the circuit court redirected the State's line of questioning. As a firearms instructor himself, it was "natural[]" to Longacre that "[y]ou don't point a gun at anything you don't intend to destroy." Longacre did not believe that someone required any special knowledge to reach that conclusion. In addition, generally speaking, Longacre noted that "[s]ometimes it's not worth arguing and objecting to very minor things."

¶20 Finally, when Miller asked Longacre whether he had ever considered the possibility that the jury would be unable to determine unanimously which of Breeden's alleged acts supported the charge of reckless endangerment, Longacre responded that he had not considered that possibility. Longacre did not see a duplicity problem when the alleged conduct was continuous over the alleged time period.

¶21 The circuit court did not find the reckless endangerment count duplicitous, and it deemed the reference to the lethality assessment to be a "minor" thing. The court acknowledged that the State had made several errors, including failing to file a motion in limine regarding other-acts evidence, eliciting opinion testimony as to an issue of ultimate fact, and commenting on Breeden's silence. The court concluded, however, that Breeden's trial counsel had raised appropriate objections throughout the trial and did not perform deficiently by failing to raise additional objections. The court further concluded that, even taking into account the cumulative effect of the State's errors, additional objections would not have produced a different result given the "very detailed" and "very compelling" testimony by the victim as to the specific incident in this case." The court denied the postconviction motion.

¶22 Breeden appeals, renewing his claims of ineffective assistance of counsel and raising an additional due process claim based upon the State's comment on his silence.

## DISCUSSION

¶23 As a threshold matter, for any issue other than the sufficiency of the evidence to be raised as a matter of right on appeal, it must first be preserved in the circuit court by a timely objection or by a postconviction motion under WIS. STAT. RULE 809.30. *See* WIS. STAT. § 974.02; *State v. Hayes*, 167 Wis. 2d 423, 425-26, 481 N.W.2d 699 (Ct. App. 1992). We will independently determine, as a question of law, whether a party has properly preserved a claim for appeal. *State v. Mercado*, 2021 WI 2, ¶32, 395 Wis. 2d 296, 953 N.W.2d 337.

¶24 Because forfeiture is a doctrine of judicial administration, we retain the authority to address an issue on appeal even if it has not been properly

9

preserved. *State v. Counihan*, 2020 WI 12, ¶27, 390 Wis. 2d 172, 938 N.W.2d 530. For instance, although we do so sparingly, we may employ the plain error doctrine to review an "obvious and substantial" error that is "so fundamental" that relief is warranted even though no contemporaneous objection was made. *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77 (citations omitted). It is our general practice, however, to review alleged unobjected-to errors within the framework of ineffective assistance of counsel. *Counihan*, 390 Wis. 2d 172, ¶28. We will follow that practice here, where Breeden has already raised claims of ineffective assistance in the circuit court and obtained an evidentiary hearing on those claims. Accordingly, we will not separately address Breeden's claim, raised for the first time on appeal, that comments on his silence during the trial violated his due process rights.

¶25 To establish a claim of ineffective assistance of counsel, a defendant must prove two elements: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. We will not set aside the circuit court's factual findings about what actions counsel took or the reasons for them unless those findings are clearly erroneous. *State v. Balliette*, 2011 WI 79, ¶19, 336 Wis. 2d 358, 805 N.W.2d 334. However, whether counsel's conduct violated the constitutional standard for effective assistance is ultimately a legal determination that this court decides de novo. *State v. Swinson*, 2003 WI App 45, ¶57, 261 Wis. 2d 633, 660 N.W.2d 12. We need not address both elements of an ineffective assistance claim if the defendant fails to make a sufficient showing on one of them. *Id.*, ¶58.

¶26 In order to demonstrate deficient performance, a defendant must overcome a presumption that counsel's actions fell within a wide range of

professional conduct. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citation omitted). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Reasonable strategic choices informed by counsel's investigation of the law and facts are virtually unchallengeable on appeal. *Id.* at 690. Counsel also does not perform deficiently by failing to bring a meritless motion. *State v. Sanders*, 2018 WI 51, ¶29, 381 Wis. 2d 522, 912 N.W.2d 16.

¶27 A defendant proves prejudice by demonstrating there is a reasonable probability that, but for his or her counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. The "reasonable probability" standard does not require a showing that it is "more likely than not" that a jury would have acquitted the defendant. *Sholar*, 381 Wis. 2d 560, ¶44 (citation omitted). Still, the "reasonable probability" standard is tied to the reviewing court's confidence in the outcome, and the "likelihood of a different result must be substantial, not just conceivable." *Id.*, ¶45; *Harrington*, 562 U.S. at at 112 (citation omitted). Thus, there is no reasonable probability of a different result based on alleged errors in a criminal trial when the conviction was otherwise supported by overwhelming evidence. *Sholar*, 381 Wis. 2d 560, ¶58.

¶28 On appeal, Breeden contends that his trial counsel provided ineffective assistance by: (1) failing to timely object to Rachel's testimony and the State's comments regarding other-acts evidence; (2) failing to object to

11

Pyfferoen's testimony and the State's comments that Rachel was at "high risk" of being killed by Breeden based upon a lethality assessment; (3) failing to object to Egle's opinion, also referred to in closing argument, that Breeden's alleged conduct met the legal standard for recklessness; (4) failing to request a curative instruction after Pyfferoen testified about Breeden's postarrest silence or to object to the State's reference to that testimony during closing argument; and (5) failing to raise a duplicity challenge to the reckless endangerment charge. Breeden further argues that the cumulative effect of the alleged errors was prejudicial to his defense. We will address each claim in turn.

## I. Other-Acts Evidence

¶29    As a general matter, evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." WIS. STAT. § 904.04(2)(a). Nonetheless, other-acts evidence may be admitted to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident that reduces the possibility that the charged conduct was innocent. *Id.* Such evidence still must be relevant under WIS. STAT. §§ 904.01 and 904.02, in that it relates to a fact or proposition of consequence to the determination of the action. In addition, the evidence's probative value must not be substantially outweighed by the danger of unfair prejudice or confusion of the issues under WIS. STAT. § 904.03. *State v. Sullivan*, 216 Wis. 2d 768, 785-89, 576 N.W.2d 30 (1998).

¶30    Breeden contends that Longacre should have raised an other-acts objection, rather than a relevance objection, to Rachel's testimony about past injuries Breeden inflicted upon her; that Longacre should have objected to Rachel's testimony on such matters sooner; that Longacre should have requested a

mistrial or a curative instruction for the testimony that Rachel gave before the sustained relevance objection; and that Longacre also should have objected to the State's reference during closing argument to the parties' history of domestic violence. Following Breeden's conviction, the circuit court held an evidentiary hearing to address Breeden's ineffective assistance of counsel claims. During the hearing, however, Miller did not directly ask Longacre why he failed to take any of these actions.

¶31 Without testimony from trial counsel about "the reasons underlying his handling of a case," this court is unable to evaluate claims of deficient performance. *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979). It is the defendant's responsibility to obtain such testimony. *Id.* We conclude that Breeden failed to adequately preserve his claims related to other-acts evidence for appellate review.

¶32 Nonetheless, we are not persuaded that Breeden could demonstrate prejudice even if he had not forfeited his ineffective assistance claims related to other-acts evidence. It is clear from the context of the entire trial that the State was offering Rachel's testimony about Breeden's long history of abuse against her to show why Rachel delayed reporting and seeking medical attention in this case. The evidence was permissible and relevant for that purpose and therefore unlikely to have been excluded under a *Sullivan* analysis.

¶33 It is possible the circuit court might have excluded the evidence based upon the State's failure to file a motion in limine. However, the evidence had limited prejudicial effect, given its relatively brief nature—as well as the lack of specificity as to when or how any of the prior injuries occurred—in relation to Rachel's extended testimony about the events of the night in question. In addition,

Rachel's account about the events at issue was partially corroborated by the photographs of her injuries and the recovery of the weapons she had described. Therefore, we conclude that there is no reasonable probability that a jury would have acquitted Breeden in the absence of the other-acts evidence.

## II. Lethality Assessment

¶34    Breeden next contends that Longacre should have objected to Pyfferoen's testimony and to the State's comments that Rachel was at "high risk" of becoming a homicide victim based upon the lethality assessment that Pyfferoen administered.  Once again, however, Breeden failed to preserve this issue by failing to ask Longacre why he did not raise those objections.

¶35    Furthermore, assuming that the lethality assessment was inadmissible for lack of foundation under WIS. STAT. § 907.02(1), we agree with the circuit court that this was a minor matter.  It would have been obvious to any juror that an abuse victim who had been threatened with a loaded firearm, beaten with the stock of a rifle, and subjected to the discharge of the rifle during a struggle would face a heightened risk of becoming a homicide victim.  Therefore, we are not persuaded that Breeden could demonstrate prejudice even if he had not forfeited his ineffective assistance claim with respect to the lethality assessment.

## III. Opinion on Recklessness

¶36    Breeden next contends that—having already successfully objected to the State asking Pyfferoen whether Breeden's reported conduct was reckless—Longacre should have objected again both when the State subsequently asked Egle his opinion about whether certain conduct was reckless, and when it referred to Egle's opinion during closing argument.  We will assume that Egle's testimony

14

constituted an inadmissible opinion as to an ultimate fact, invading the province of the jury. *See **Lievrouw v. Roth***, 157 Wis. 2d 332, 351-52, 459 N.W.2d 850 (Ct. App. 1990) (an expert cannot give an opinion on a legal concept requiring definitional instruction).

¶37 We conclude that Longacre's failure to raise a second objection was not deficient, however, because Longacre provided a reasonable explanation for why he viewed the testimony as nonprejudicial, and therefore not worth an additional objection. Specifically, it was reasonable for Longacre to believe that it did not take any special knowledge to reach the "natural" conclusion that pointing a loaded weapon at someone and discharging a weapon during a struggle were reckless acts.

## IV. Comments on Breeden's Silence

¶38 Breeden next contends that Longacre should have requested a curative instruction or a mistrial after Pyfferoen testified about Breeden's postarrest silence and also should have objected to the State's additional comment linking silence to guilt during closing argument. *See generally **State v. Brecht***, 143 Wis. 2d 297, 310-11, 421 N.W.2d 96 (1988) (holding testimony regarding a defendant's election to remain silent violates the Fifth Amendment); ***State v. Nielsen***, 2001 WI App 192, ¶¶30-31, 247 Wis. 2d 466, 634 N.W.2d 325 (holding the State may not argue that a defendant's silence is inconsistent with a claim of innocence).

¶39 We note that Breeden has not explained what curative instruction he believes should have been given, nor has he addressed the standard for obtaining a mistrial. In any event, we are not persuaded that Longacre performed deficiently by failing to seek additional relief based upon Pyfferoen's testimony. The

testimony at issue was given in response to a line of questions about the efforts law enforcement officers had to take to locate Breeden. The main focus of the questions was on whether Breeden evinced consciousness of guilt by flight. Longacre did object to the testimony. That objection was sustained by the circuit court. It was reasonable for counsel to cut off the line of questioning before it strayed into whether an inference of guilt also could be drawn from Breeden's silence. It was also reasonable for counsel to assume there had been little prejudice from the jury hearing that Breeden requested a lawyer before speaking to law enforcement. Moreover, while Breeden did not request a specific curative instruction, the court did give a pattern instruction to the jury to disregard any question that the court did not allow to be answered, without the jury guessing at what the answer might have been. *See* WIS JI—CRIMINAL 147 (2000).

¶40 The State's comment during closing argument that "guilty people will usually not want to talk about it" is somewhat more troubling. Nonetheless, even assuming that this remark constituted an impermissible comment on Breeden's silence, we conclude Breeden was not prejudiced by Longacre's failure to object to the comment.

¶41 Breeden argues that using his right to remain silent against him was prejudicial because this case was largely about credibility. However, Breeden ignores the physical evidence in this case including the multiple documented injuries that Rachel suffered such as bruises on her back and defensive injuries to her arms. There is no explanation in the record for how Rachel would have obtained those injuries other than by a beating such as the one that she described. The recovery of the guns, including one with a broken stock, and the notations on Breeden's calendar also supported Rachel's account. Therefore, this case was not merely about credibility. Furthermore, the State's comment on Breeden's silence

during closing argument was again closely intertwined with its permissible argument that Breeden evinced consciousness of guilt by evading police. Given that the jury could already draw a permissible inference of guilt based upon Breeden's flight, we are not persuaded that the additional suggestion that it could draw an inference of guilt based upon his silence had any reasonable probability of altering the outcome of the trial.

## V. Duplicity

¶42 Finally, Breeden contends that Longacre should have challenged the jury instructions and verdict form on duplicity grounds. Once again, Breeden failed to preserve this ineffective assistance claim by not asking Longacre why he did not raise a duplicity challenge. Furthermore, we are not persuaded that Breeden could demonstrate deficient performance even if he had not forfeited the issue.

¶43 Duplicity is the joining of two or more separate offenses into a single count. *State v. Lomagro*, 113 Wis. 2d 582, 586, 335 N.W.2d 583 (1983). It may occur when there is evidence of more than one act that might establish the charged offense, but neither the pleadings, the jury instructions, nor the verdict identify which act pertains to the count. However, when an offense is composed of a series of continuous acts committed by the same person at substantially the same time relating to one continued transaction, the State has discretion whether to charge the acts separately or together. *State v. Jacobsen*, 2014 WI App 13, ¶18, 352 Wis. 2d 409, 842 N.W.2d 365 (2013).

¶44 Here, Longacre did not perform deficiently by viewing Breeden's alleged acts as continuous. Breeden committed each of the four alleged acts underlying the reckless endangerment charge (i.e., beating Rachel in the car,

17

beating her on the couch, striking her with the rifle, and pointing and discharging the rifle) over the course of the same evening, and all of the acts were motivated by Breeden's same expressed belief that Rachel was depicted in online pornography sites. Furthermore, Breeden has not explained how challenging the jury instructions or verdict form would have benefitted him, given that the State could then have moved to amend the Information to conform to the proof at trial. *See **State v. Malcom***, 2001 WI App 291, ¶¶23-30, 249 Wis. 2d 403, 638 N.W.2d 918. It was not unreasonable for Longacre to avoid exposing Breeden to the possibility of added charges.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.