STATE of Wisconsin,† Plaintiff-Respondent,

v.

Todd A. BRECHT, Defendant-Appellant.

Court of Appeals

*No. 86–1317–CR. Submitted on briefs January 16, 1987.—
Decided March 17, 1987.*

(Also reported in 405 N.W.2d 718.)

† Petition to review granted.

For the defendant-appellant, Todd A. Brecht, there briefs submitted by *Janet A. Jenkins* and *John Brinckman* of *Arneson & Jenkins, S.C.* of La Crosse.

For the plaintiff-respondent, State of Wisconsin, there was a brief submitted by *Bronson C. La Follette,* attorney general and *Michael L. Zaleski,* assistant attorney general of Madison.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J. Todd Brecht appeals a judgment convicting him of first-degree murder with the use of a dangerous weapon, contrary to secs. 940.01 and 939.63(1)(a), Stats. Brecht argues that his conviction should be overturned because the state's comments on his post-arrest silence violated his constitutional right to due process of law and his privilege against self-incrimination. Additionally, Brecht contends that the trial court erred by admitting evidence of his homosexuality and concluding that should he introduce evidence of his nonviolent character, the state could introduce evidence of his prior worthless check convictions.[1] We agree that the state's comments on Brecht's

---

[1]Brecht also argues that his conviction should be reversed

silence impermissibly infringed on his right to a fair trial and that the trial court erred in its evidentiary rulings. The judgment is reversed.

In 1985, Brecht was convicted in Georgia of felony theft. In October of that year, Brecht's sister, Molly Hartman, and her husband, Roger Hartman, paid the restitution imposed for Brecht's crime and obtained his release from jail and the transfer of his probationary supervision to Wisconsin. The Hartmans brought Brecht back to Alma, Wisconsin, to live with them until he could be placed in a halfway house.

On October 17, Brecht shot and mortally wounded Roger Hartman. Brecht fled the scene and did not summon medical assistance or attempt to aid Hartman. Later that day, Brecht was taken into custody in Winona, Minnesota, and was told that he was being held in connection with a shooting incident in Wisconsin. Brecht responded that "it was a big mistake" and thereafter remained silent.

Brecht was ultimately charged with first-degree murder. At trial, Brecht testified that on the day of the incident, he had been using one of Hartman's guns to shoot at a soda can. Brecht stated that when he saw Hartman pulling into the driveway, he ran into the house to replace the gun but tripped and fell causing the gun to discharge. Hartman was struck in the back. Brecht testified that the shooting was accidental and that he did not intend to harm Hartman.

Over defense counsel's objections, the prosecutor during cross-examination repeatedly questioned

because of the prosecutor's alleged prosecutorial misconduct. Because Brecht's conviction must be reversed on other grounds, we need not address this issue. *See State v. Hurd,* 135 Wis. 2d 266, 400 N.W.2d 42, slip opinion at note 5 (Ct. App. 1986).

Brecht as to why he had not informed the arresting authorities that the shooting was accidental. With regard to Brecht's silence when first taken into custody, the prosecutor asked:

> Q. And you were being awfully doggone selective [sic] as to who you were going to talk to weren't you?
>
> A. I guess I was, yes sir.
>     . . . .
>
> Q. And I take it that Officer Papke did not meet your criteria, so you said nothing to him?
>
> A. I didn't say nothing to him, no sir.
>
> Q. So you were contacted by two law enforcement officers within a matter of about 20 or 25 minutes, and you never breathed a word of what happened at the Hartman residence, is that correct?
>
> A. No sir, I just said that it was a mistake.

Referring to Brecht's silence while being held by the Winona police, the prosecutor asked:

> Q. At that time you told him what had happened, is that right?
>
> A. No, I did not tell him.
>     . . . .
>
> Q. Did you ever tell any law enforcement officer that evening what had happened?
>
> A. I just said it was a mistake, I wanted to talk to somebody is what I said.
>
> Q. The place was crawling with cops wasn't it, at the Law Enforcement Center at Winona?
>
> A. There were a few officers there, yes.

Q. You could have told any one of the officers what had happened.

A. Yes, I could have sir.

Q. But you didn't did you?

A. I did not.

Q. In fact the first time you have ever told this story is when you testified here today was it not?
. . . .

A. You mean the story of actually what happened?

Q. Yes.

A. I knew what happened, I'm just telling it the way it happened, yes, I didn't have a chance to talk to anyone, I didn't want to call somebody from a phone and give up my rights, so I didn't want to talk about it, no sir.

Again, on its recross-examination of Brecht, the prosecutor questioned:

Q. Did you tell anyone about what had happened in Alma?

A. No. I did not.

Q. Again, with regard to Officer Papke, you told him that you wanted to talk to somebody, ... but you didn't tell Officer Papke what happened?

A. No, I did not ....

In its closing argument, the state urged the jury to "remember that Mr. Brecht never volunteered until in this courtroom what happened in the Hartman residence ... he made no statements to the law enforcement officers ... [h]e sits back here and sees all of our evidence go in and then he comes out with this

163

crazy story ...." In its closing argument on rebuttal, the state asserted, "I know what I'd say, I'd say 'hold on, this was a mistake, this was an accident, let me tell you what happened' but he didn't say that did he. No, he waited until he hears our story."

Brecht argues that the state's comments on his post-arrest silence violated his constitutional right to due process of law and against self-incrimination guaranteed under the fifth and fourteenth amendments to the United States Constitution and art. I, sec. 8, of the Wisconsin Constitution. Each stage of Brecht's silence must therefore be analyzed in a constitutional light.

### PRE-ARREST, PRE-MIRANDA SILENCE

As a starting point, we note that because no governmental action was involved, comments on Brecht's pre-arrest, pre-*Miranda* silence were permissible. *Jenkins v. Anderson,* 447 U.S. 231, 239–40 (1980). Thus, the state could properly question Brecht, and comment to the jury, on his failure to aid Hartman or summon medical assistance, and his flight from the scene.

### POST-ARREST, PRE-MIRANDA SILENCE

In *Fletcher v. Weir,* 455 U.S. 603, 606–07 (1982), the United States Supreme Court held that the states may adopt their own rules as to whether it is permissible to comment on a defendant's post-arrest, pre-*Miranda* silence. The Court reasoned that this inquiry did not violate due process because the defendant's silence was not induced by *Miranda* warnings informing him of his right to remain silent and

implicitly assuring him that his silence would not be used against him. *Id.*

This reasoning seems predicated upon the dubious proposition that a defendant only invokes his right to remain silent after he is formally advised of this right. In a modern society with mass communications publicizing a defendant's constitutional right to remain silent, it is at least an arguable assumption that by remaining silent a defendant is relying upon his constitutional right to do so, even though he has not been formally advised of it. Regardless, this issue may be determined by each state under its own laws and constitution.

Our supreme court has indicated that comments on a defendant's post-arrest, pre-*Miranda* silence are impermissible. *See State v. Fencl,* 109 Wis. 2d 224, 236–37, 325 N.W.2d 703, 710–11 (1982); *Reichoff v. State,* 76 Wis. 2d 375, 378–80, 251 N.W.2d 470, 472–73 (1977). Because this holding rests upon a defendant's privilege against self-incrimination as guaranteed under the fifth amendment and art. I, sec. 8, of the Wisconsin Constitution, it is unaffected by the due process analysis employed in *Fletcher.* Any change from this position must properly emanate from our supreme court. *State v. Grawien,* 123 Wis. 2d 428, 432, 367 N.W.2d 816, 818 (Ct. App. 1985).

On cross-examination, the state repeatedly questioned Brecht on his silence following his arrest and detention by the Winona authorities. The state not only commented on Brecht's silence, but vigorously argued that this silence was evidence that Brecht fabricated the accidental shooting story after the state had introduced all of its evidence. These comments on Brecht's post-arrest, pre-*Miranda* silence were imper-

missible. *See Fencl,* 109 Wis. 2d at 236–37, 325 N.W.2d at 710–11.

The state attempts to justify its comments on Brecht's silence by claiming that he opened the door to such inquiry by testifying that he wanted to talk to someone about what happened and that "it was a mistake." It is true that a defendant's own testimony may permit the prosecutor to question him about his silence. *United States v. Shaw,* 701 F.2d 367, 384 (5th Cir. 1983), *cert. denied,* 465 U.S. 1067 (1984). Brecht's statements, however, were made in response to the state's repeated questioning as to why he had never told any law enforcement officer that the shooting was accidental. In the face of such questions, it cannot be said that Brecht's responses permitted further inquiry, but, rather, that Brecht's statements were solely the result of improper questioning on his silence.

■

Because we conclude that the state's comments on Brecht's post-arrest, pre-*Miranda* silence were constitutional error, we must next determine whether that error was harmless beyond a reasonable doubt. *Fencl,* 109 Wis. 2d at 238, 325 N.W.2d at 711. A court may find a constitutional error harmless if there is no reasonable possibility that the error contributed to the conviction. *Id.* In making this determination, a court applies a three-pronged test that examines the frequency of the error, the nature of the state's evidence, and the nature of the defense. *Id.*

The frequency of the error involves not just a numerical computation but an examination of the comments within the context of the entire trial. The state asserts that the error was not prejudicial because, although the trial transcript totaled more than

900 pages, there were "only" three brief references in closing argument and inquiry during cross- and recross-examination of less than three pages. The question of prejudice, however, is not so easily answered.

The state's reference to Brecht's silence in both cross- and recross-examination went far beyond a simple inquiry as to his silence but involved a detailed recitation as to the various opportunities he had to explain the accident to a number of officers. This questioning led Brecht to testify that he wished to explain what had happened and the state's further exploration as to why he did not explain. Based upon the nature and length of the state's comments on Brecht's silence, and the vigorous nature in which his silence was argued as proof of his fabrication of an accidental shooting, we conclude that, under the frequency test, prejudice existed.

The second inquiry involves the nature of the state's evidence against Brecht. The state presented overwhelming and uncontradicted evidence that Brecht shot Hartman and caused his death. The disputed and ultimate issue was Brecht's intent at the time of the shooting. On this issue, the state relied entirely on circumstantial evidence. Accordingly, the state's comments on Brecht's failure to inform the authorities that the shooting was accidental was highly prejudicial and may have unduly influenced the jury.

The final test for harmless error concerns the nature of the defense. Brecht contended that the shooting was accidental. His testimony regarding the circumstances of the shooting and his intentions at that time raised the issue of his credibility to a critical level. The state's argument that Brecht's silence was

inconsistent with his testimony, and its use of his silence as an attack on his credibility, also contributes to the danger that Brecht was prejudiced by this error.

## POST-ARREST, POST-MIRANDA SILENCE

Whatever latitude the state may have in regard to commenting on a defendant's post-arrest, pre-*Miranda* silence, no such latitude exists in regard to silence following arrest and *Miranda* warnings. Such silence is constitutionally protected, and any comment thereon violates a defendant's due process right to a fair trial. *Wainwright v. Greenfield*, — U.S. —, 106 S. Ct. 634, 638–39 (1986).

It is unclear from the record whether Brecht was informed of his *Miranda* rights when first taken into custody. The record does demonstrate, however, that Brecht was informed of these rights at his initial court appearance. The state's assertions in closing arguments that Brecht first volunteered his accidental shooting story after the state had presented its evidence were comments on Brecht's post-*Miranda* silence. Those comments violated Brecht's right to due process of law. *See Wainwright*, 106 S. Ct. at 638–39.

The prosecutor's comments on Brecht's post-arrest, post-*Miranda* silence were also prejudicial. Although the comments were infrequent, Brecht's credibility was undermined by the prosecutor's suggestion that his continued silence was proof that he had fabricated the accidental shooting story after hearing the state's evidence against him. In a first-degree murder prosecution in which intent is established solely by circumstantial evidence and the defendant's

credibility is a critical issue, impermissible comments that attack credibility heighten the danger of prejudice. See *Reichoff,* 76 Wis. 2d at 381–82, 251 N.W.2d at 473–74. Because the defense relied heavily upon Brecht's credibility and because the prosecutor's comments were clearly improper, we conclude that the comments on Brecht's post-arrest, post-*Miranda* silence were prejudicial.

In summary, we conclude that the state's comments on Brecht's silence constituted prejudicial error. We therefore conclude that Brecht's conviction must be reversed.

Brecht contends that his conviction should be reversed on several other grounds. Because addressing these issues may be helpful on any retrial, we will examine these contentions.

Brecht argues that the trial court erred by admitting evidence of his homosexuality. The admission of this evidence was predicated upon Hartman's disapproval of Brecht's lifestyle and his communication of this feeling to Brecht. An argument between the two concerning Hartman's attitude would provide Brecht with a possible motive to shoot Hartman. The state expected Hartman's wife, Molly, to testify that Hartman had informed Brecht of his feelings concerning Brecht's lifestyle. During the trial, however, Molly specifically denied that Hartman had ever communicated his disapproval of Brecht's homosexuality to Brecht.

We recognize that a trial court has broad discretion in determining the relevancy and admissibility of proffered evidence. *State v. Pharr,* 115 Wis. 2d 334, 342–45, 340 N.W.2d 498, 501–03 (1983). A trial court's determination of relevancy will be upheld unless it

constitutes an abuse of discretion. *Id.* at 342, 340 N.W.2d at 501. A reviewing court will not find an abuse of discretion if there is a reasonable basis for the trial court's determination. *Id.*

Although evidence of motive is not an element of the crime charged, it is admissible if it meets the relevancy standards of sec. 904.01, Stats.[2] *State v. Phillips,* 99 Wis. 2d 46, 54, 298 N.W.2d 239, 243 (Ct. App. 1980). This statute has been interpreted to mean that any fact that tends to prove a material issue is relevant. *Pharr,* 115 Wis. 2d at 344, 340 N.W.2d at 502.

Here, evidence of Brecht's homosexuality was irrelevant. Although it is true that one of the conditions of Brecht's remaining in the Hartman home was that he not engage in homosexual conduct, the imposition of such a rule approximately one week prior to the shooting fails to establish a motive for murder. If the evidence had established a connection between Brecht's lifestyle and motive, admitting evidence of Brecht's homosexuality may have been justified. In the absence of such evidence, evidence of Brecht's homosexuality was not probative of motive or any other material issue underlying the crime charged. Irrelevant evidence should not be admitted. Section 904.02, Stats. Accordingly, we conclude that the trial court erred by admitting this evidence.

Brecht also contends that the trial court erroneously determined that the state could introduce evi-

---

[2]Section 904.01 defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

dence of his prior worthless check convictions should he open the door to this evidence. During the trial, Brecht advised the court that he intended to call his probation officer, Mrs. Rusch, to testify as to her opinion of his nonassaultive, nondangerous character. A defendant may introduce character evidence of nonviolence. *King v. State,* 75 Wis. 2d 26, 38–39, 248 N.W.2d 458, 464–65 (1977); sec. 904.04(1)(a), Stats. The court ruled that should such evidence be introduced, it would permit the state to cross-examine Rusch concerning Brecht's worthless check convictions.

A cross-examination of Rusch concerning Brecht's worthless check convictions is totally unrelated to the question of a character trait of nonviolence. The court therefore erred by declaring that Rusch's testimony would open the door to a detailed recitation of Brecht's prior convictions. *See* sec. 904.05(1), Stats.

*By the Court.*—Judgment reversed.